IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

BECKLEY DIVISION

| | | |
|---|---|---|
| BARBARAH J. McPHERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:07-0367 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Order entered June 7, 2007 (Document No. 4.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 15 and 21.)

The Plaintiff, Barbarah J. McPherson, (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on February 3, 2004 (protective filing date), alleging disability as of February 1, 2004, due to temporary vision loss; temporary weakness of her extremities; pain in her hands, arms, legs, feet, and back; and hearing problems.[1] (Tr. at 23, 59, 70-72, 94, 418-20.) Claimant's DIB application

---

[1] Claimant alleged in her form Disability Report - Appeal that she also was disabled due to problems with balance, coordination, and gait, as well as anxiety, depression, and coporferia. (Tr. at 142, 430.)

was denied initially because she did not meet the insured status requirements. (Tr. at 23.) The SSI claim was denied initially and upon reconsideration. (Tr. at 422-24, 430-32.) On March 10, 2005, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 433.) Prior to the hearing, Claimant filed on September 7, 2005, a subsequent application for DIB. (Tr. at 23.) Claimant was found to have met the insured status requirements through March 31, 2008, based on her work activity in 2004. (Id.) Given that the SSI claim was at the hearing level, Claimant's DIB claim was escalated to the hearing level. (Id.) The hearing was held on November 3, 2005, before the Honorable Theodore Burock. (Tr. at 440-74.) By decision dated February 24, 2006, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 23-34.) The ALJ's decision became the final decision of the Commissioner on April 6, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 6-10.) Claimant filed the present action seeking judicial review of the administrative decision on June 7, 2007, pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to

2

Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently,

appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity at any time relevant to the decision. (Tr. at 26, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from cervical disc disease, carpal tunnel syndrome, depression, anxiety, a visual impairment, and porphyria, which were severe impairments. (Tr. at 26, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 29, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity

> to perform simple routine, repetitive tasks at the limited light exertional level. Specifically, she can lift and carry 20 pounds occasionally and 10 pounds frequently, can stand/walk for 6 hours in an 8 hour day and can sit for 6 hours in an 8 our day. She can further perform jobs as long as they do not require working outdoors, concentrated and extensive exposure to sunlight, concentrated exposure to extreme cold and dampness, operating a motor vehicle or dangerous machinery and exposure to dangerous situations.

(Tr. at 29, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 32 at Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ nonetheless concluded, that Claimant could perform jobs such as a hand packer, price marker, and produce sorter, at the light level of exertion. (Tr. at 33.) On this basis, benefits were denied. (Tr. at 33-34, Finding No. 11.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on March 17, 1960, and was 45 years old at the time of the administrative hearing. (Tr. at 32, 70, 443.) Claimant has an eleventh grade education and a generalized equivalency diploma ("GED"). (Tr. at 32, 100, 283, 295, 445.) In the past, she worked as a groundskeeper or lawn

care assistant, retail stocker, and craft maker. (Tr. at 32, 121-27, 469.)

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) assessing Claimant's severe impairments at step two of the sequential analysis, (2) assessing Claimant's residual functional capacity ("RFC") when he improperly discredited the opinions of Claimant's treating and examining physicians and Claimant's subjective allegations of pain and other symptoms, and (3) presenting hypothetical questions to the Vocational Expert ("VE"). (Document No. 17 at 8-26.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 21 at 11-20.)

1. Severe Impairments.

Claimant first alleges that the ALJ erred at step two of the sequential analysis when he failed to acknowledge Claimant's headaches, blurred vision, radicular low back and leg pain, left sided weakness, bilateral foot pain, obesity, bladder problems, memory loss, and concentration problems as severe problems.[3] (Document No. 17 at 9-13.) Claimant further alleges that at step two, the ALJ failed to consider and identify properly all of the residuals of Claimant's acknowledged severe impairments arising from her depression, anxiety, and multiple visual impairments. (Id. at 13-16.)

_____

[3] Claimant also alleges that at step three of the sequential analysis, the ALJ "failed to properly consider her entitlement to benefits under applicable listings of impairment." (Document No. 17 at 10.) The Commissioner asserts that Claimant "presents no evidence of record purporting to satisfy the medical criteria of a listing, and thus, no reasonable challenge to the step three finding." (Document No. 21 at 11.) The undersigned agrees with the Commissioner and finds that Claimant has asserted a challenge to the ALJ's step three finding but failed to provide any argument or evidence supporting her challenge. In the absence of supporting evidence, the undersigned finds that Claimant has not asserted a proper challenge to the ALJ's step three finding.

The Commissioner asserts that Claimant "does not identify a distinctive, objective, medically determinable . . . impairment of record, resulting in additional work-related limitations, not considered by the ALJ." (Document No. 21 at 12.) To the extent that Claimant has severe symptoms and functioning, the Commissioner asserts that the ALJ duly considered her severe and non-severe limitations at step four in his residual functional capacity assessment. (Id.) The Commissioner further asserts that Claimant has not identified any functional work-related limitations that would preclude her from performing the jobs identified by the vocational expert. (Id.) Rather, the Commissioner asserts that Claimant "fails to appreciate the difference between medically determinable impairments and resulting symptoms." (Id. at 21.)

To be deemed disabled, a claimant must have an impairment or combination of impairments which is severe, meaning that it "significantly limits your physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2006). Basic work activities are the abilities and aptitudes necessary to do most jobs, including: physical functions such as sitting and standing; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. Id.; §§ 404.1521(b)(1)-(6); 416.921(b)(1)-(6). Conversely, "[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (emphasis in original). An inconsistency between a claimant's allegations about the severity of an impairment and the treatment sought is probative of credibility. See Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994). As discussed above, the determination whether a claimant has a severe impairment is made at the second step of the sequential analysis.

The ALJ in the instant matter determined at step two of the sequential analysis that Claimant had the severe impairments of cervical disc disease, carpal tunnel syndrome, depression, anxiety, a visual impairment, and porphyria. (Tr. at 26.) Claimant argues that the ALJ failed to acknowledge other severe impairments involving her low back, both legs and feet, bladder, headaches, multiple visual impairments, loss of balance, left-sided weakness, bilateral foot pain, and obesity. (Document No. 17 at 10.) The undersigned will address each alleged impairment in turn.

A. *Visual Impairments, Headaches, Loss of Balance, & Left-sided weakness*.

Claimant initially experienced neurological problems in 1999 when she reported episodes of tunnel vision, followed by pressure or tightness of her head and roof of mouth. (Tr. at 26, 322-24, 331.) She was examined in the emergency room where she was diagnosed with a neurologic migraine. (Id.) Dr. Othman concluded that she suffered from intermittent loss of vision of both eyes, which most likely resulted from a complicated migraine. (Tr. at 26, 321-22.) On May 1, 2002, Claimant complained of blurred vision, watery eyes, having seen large areas of color, occasional dizziness, and numbness of her extremities. (Tr. at 26, 329.) An EMG/NCS revealed only mild right carpal tunnel syndrome, and Dr. Othman opined that carpal tunnel syndrome also caused the numbness and tingling on the left. (Tr. at 26, 325-28.) Dr. Othman noted that despite her multiple neurological complaints, Claimant had mild, if any objective neurological findings. (Tr. at 26, 332.) He opined that her symptoms may have been non-organic in nature. (Id.)

In December, 2003, Claimant reported to her primary care physician, Dr. Pam Butcher, D.O., that she had blurred vision. (Tr. at 246.) Dr. Butcher referred Claimant to a neurologist. On May 6, 2004, Claimant was examined by neurologist Dr. Robert J. Crow. (Tr. at 26, 409-12.) She reported, *inter alia*, intermittent visual disturbances, clumsiness, and feelings of imbalance. (Tr. at 26, 409.) Neurological exam and coordination revealed difficulty with ambulation and he diagnosed, *inter alia*, dyesthesias. (Tr. at 26, 411-12.) On examination by Dr. Eugene Evans, D.O., Claimant's vision was

9

20/30 in both eyes without correction and 20/20 with correction. (Tr. at 26, 208.) On October 4, 2004, Dr. Alamelu Murugapppan, M.D., noted Claimant's reports of vision problems in that she did not see colors very well, and also noted Claimant was not specific in describing her symptoms. (Tr. at 27, 260.) Claimant reported that blurred vision lasted from one to two hours, that she had never lost her vision or had double vision, and that she did not have any visual field deficits. (Id.) She also described paresthesia-like sensations over her body when driving. (Id.) Dr. Murugappan's examination essentially was normal with the exception of some problems in tandem walking and hopping on either foot. (Tr. at 27, 261.) Claimant reported in November, 2004, that her visual problems were better. (Tr. at 27, 258.)

On February 17, 2005, Dr. Taoufik Sadat, M.D., diagnosed Claimant with pre-glaucoma. (Tr. at 339. In April, 2005, Claimant reported that she rarely experienced headaches. (Tr. at 336.) On August 9 and September 1, 2005, Claimant reported to John O. Collins, D.O., vision and balance problems, as well as loss of feeling in her left arm. (Tr. at 28, 344-48.) Dr. Collins noted that Claimant's problems resulted from visual disturbances. (Tr. at 28, 347.)

As discussed above, the ALJ found that Claimant's visual impairment was severe. It is apparent that the ALJ considered Claimant's numerous complaints of vision problems and properly considered them under the single classification of a severe impairment. See Boling v. Astrue, ____ F.Supp.2d ____, 2008 WL 582976, *2 (S.D. W.Va. Feb. 29, 2008) (finding that "[c]ombining similar impairments when making a severity determination, is, however, proper under the regulations, and has caused the plaintiff no prejudice. [20 C.F.R.] § 404.1520(c).").

Though Claimant reported headaches, left-sided weakness, and imbalance on occasion, there is nothing in the evidence to suggest that these conditions had more than a minimal affect on her ability to perform work-like activities. One physician even opined that these problems were symptoms of her visual impairments. The ALJ found that Claimant's porphyria is a severe impairment. The symptoms

of imbalance, weakness, headaches, and other neurological problems often are associated symptoms of porphyria. Accordingly, the undersigned finds that the ALJ's step two decision regarding Claimant's visual impairment is supported by substantial evidence, and that the evidence does not support a severe impairment of left-sided weakness, imbalance, headaches, or further visual impairments.

   B. *Low back pain, radicular lower extremity pain, & bilateral foot pain.*

   Regarding Claimant's low back and radicular lower extremity pain, the evidence of record reveals that Claimant was diagnosed with cervical spondylosis with some foraminal narrowing related predominantly to osteophyte formation. (Tr. at 26, 198, 237.) On May 6, 2004, claimant reported to Dr. Crow, that she experienced low back pain with radiation of pain into both legs in a generalized fashion. (Tr. at 26, 409.) Dr. Crow observed on examination that Claimant had an unsteady gait and was unable to heel-toe walk, but had normal range of motion, muscle strength and tone, and negative straight leg raising. (Tr. at 26, 410-11.) He diagnosed back and neck pain, dysesthesias, and cervical spondylosis. (Tr. at 26, 412.) Dr. Crow reviewed Claimant's cervical MRI scan and noted that it was not impressive for any pathology that caused her symptoms. (Id.)

   On June 27, 2004, Claimant underwent a disability evaluation by Dr. Evans. (Tr. at 26-27, 207-12.) Claimant reported pain in her middle and upper back with occasional weakness and pain in her arms and right lower extremity, and constant weakness in her left lower extremity. (Tr. at 26, 207.) The pain was made better with muscle rubs, warm temperatures, and rest, and worsened by sitting, standing, or lying down for long periods of time; overexertion; and hot, humid weather. (Id.) On physical exam, Dr. Evans observed that Claimant walked with a limp favoring her left leg, used no assistive devices, was unable to heel walk on the left due to heel pain, and was able to squat and arise with some difficulty. (Tr. at 26, 208.) She exhibited some tenderness to palpation over the paravertebral musculature of the thoracic and lumbar spine and tenderness to palpation of the heel.

11

(Id.) Despite these findings, Dr. Evans opined that "[i]t appeared that she probably would be able to do certain work-related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling at least on a light to moderate duty basis."

Dr. Butcher acknowledged Claimant's heel pain and diagnosed plantar fasciitis on June 30, 2004. (Tr. at 227.)Claimant had complained of severe bilateral foot pain in 2001, and again reported pain in her feet in August, 2005. (Tr. at 344.) X-rays of her left foot were normal. (Tr. at 195.) Claimant reported to Dr. Murugappan, on October 4, 2004,  only occasional low back pain and problems with gait as her foot dropped down. (Tr. at 27, 260.) On exam, Claimant had a normal gait, but was unable to tandem walk or hop on either foot. (Tr. at 27, 261.) Her exam essentially was normal in all other respects. (Id.) In November, 2004, Claimant reported that she was a lot better, though her legs occasionally gave out. (Tr. at 27, 258.) Her exam revealed similar, if not the same results. (Tr. at 27, 259.) The EMG/NCS studies revealed no radicular or peripheral neuropathy. (Tr. at 27, 259, 325-26.) Dr. Murugappan diagnosed degenerative joint disease of the cervical spine. (Id.) By April 8, 2005, Claimant reported that her symptoms were better. (Tr. at 28, 338.)

Despite some inability to tandem walk and hop on either foot, there is no evidence that Claimant's back, leg, and feet pain had more than a minimal affect on her ability to perform work-like activity. Claimant's gait was normal, as was her strength, motor function, sensation, range of motion, straight leg raising, and neurological exams. The ALJ's finding of cervical spondylosis and porphyria as severe impairments reflects limitations in Claimant's mobility and ability to lift and carry heavy objects. (Tr. at 28-29.) The objective medical evidence of record fails to demonstrate that Claimant also had separate severe impairments of back, leg, and foot pain. These conditions are to a certain extent considered symptoms of cervical spondylosis and porphyria. Despite Claimant's allegations of pain, Dr. Evans opined that Claimant was able to perform light to moderate level activity. Accordingly, the undersigned finds that the ALJ did not err in failing to find severe impairments of low back pain,

radicular lower extremity pain, and bilateral foot pain.

    *C. Obesity.*

    The medical evidence clearly indicates that Claimant was 5'4" in height, weighed approximately 200 pounds, and had a body mass index of 35 to 36, and therefore, was mildly to grossly obese. (Tr. at 256, 258, 261, 314,316, 319, 323, 337.) However, the medical evidence does not reveal any limitations resulting from Claimant's obesity, whether considered individually, or in combination with other impairments, that would have more than minimally affected her ability to perform work-like activities. Claimant does not identify how her obesity prevents her ability to perform basic work-like activities. As the Commissioner notes, the ALJ questioned Claimant at the administrative hearing about her obesity and acknowledged the medical sources who referenced her obesity. Thus, the ALJ was aware of Claimant's obesity and considered it in assessing Claimant's severe impairments. Accordingly, the undersigned finds that the ALJ properly did not find Claimant's obesity as a severe impairment.

    *D. Bladder problems.*

    The medical evidence reveals that Claimant was diagnosed with an overactive bladder, based on her complaints of urinary frequency and urge incontinence. (Tr. at 242, 246.) In October, 2004, Claimant reported that she was unable to hold urine and experienced an increased urgency. (Tr. at 260.) Claimant reported that several medications had not helped control the problem and that she occasionally wore Depends. (Id.) She denied bowel problems. (Id.) On December 19, 2005, Dr. S. K. Shammaa noted that Claimant suffered "from stress incontinence, causing urinary frequency which is aggravated by lifting, bending or stooping." (Tr. at 415.) He opined that this frequency or urgency of urination would interfere with a job, whether or not it was sedentary exertional level work. (Tr. at 416.) Despite these problems, the undersigned finds that Claimant has not demonstrated that her bladder problems have more than a minimal affect on her ability to perform basic work activities.

13

Claimant reported only two incidents in which she had urine leakage in public and further reported that she wore Depends to control her problems. As the ALJ noted, the medical evidence contains few references to a problem alleged to be a severe impairment. Accordingly, the undersigned finds that the ALJ's decision not to find Claimant's bladder problems to be a severe impairment is supported by substantial evidence.

 E. *Memory & concentration problems*.

 As discussed above, the ALJ found Claimant's depression and anxiety to be severe impairments. (Tr. at 26.) The mental evidence of record reveals Claimant's reports of poor concentration, memory problems, and confusion. (Tr. at 260, 294.) On mental status examination on January 17, 2005, Sunny S. Bell, M.A., opined that Claimant's concentration was markedly deficient based on three errors in performing serial three's. (Tr. at 284.) Ms. Bell however, opined that Claimant's immediate memory was normal, her remote memory was mildly deficient, and her recent memory was moderately deficient. (Tr. at 284.) The records of Claimant's treating psychiatrist, Dr. Rhonda Hamm, M.S., D.O., and her therapist at Willow Ridge primarily reflect accounts of normal memory, with occasional notations of deficient short-term memory. (Tr. at 289-98, 366-90, 401-04.) Dr. Hamm and Claimant's therapist, Stephanie Mendelson, however, diagnosed only post traumatic stress disorder and mood disorder NOS. (Id.) Dr. Debra L. Lilly, Ph.D., a state agency medical consultant likewise opined that "there is no identified neurological disorder to account for memory or concentration issues." (Tr. at 311.) Dr. Lilly opined that Claimant's ability to maintain concentration was only mildly limited. (Tr. at 309.) Accordingly, the undersigned finds neither Claimant nor the evidence of record demonstrate that Claimant's alleged problems with concentration and memory caused more than a minimal affect on her ability to perform work-like activities. Accordingly, the undersigned further finds that the ALJ properly did not find these problems as severe impairments.

 Based on the foregoing, the undersigned finds that the ALJ's step two findings are supported

by substantial evidence. To the extent that Claimant alleges that the ALJ failed to consider the residuals of her severe and non-severe impairments, the undersigned finds that such considerations are, and were, properly made in the ALJ's residual functional capacity assessment.

2. <u>RFC Assessment</u>.

Next, Claimant alleges that the ALJ erred in assessing Claimant's residual functional capacity ("RFC") by ignoring all of Claimant's significant impairments, improperly rejecting the opinions of Claimant's treating and examining physicians without sufficient explanation, and by making an improper credibility assessment of Claimant's testimony and allegations. (Document No. 17 at 19-23.) The Commissioner asserts that Claimant's arguments are without merit and that the ALJ's RFC assessment is supported by substantial evidence. (Document No. 21 at 12-20.)

A. *<u>Treating and Examining Opinions.</u>*

Claimant argues that the ALJ erred in rejecting the opinions of Claimant's treating and examining physicians without sufficient explanation. (Document No. 17 at 8.) The Commissioner asserts that the ALJ properly evaluated the medical source opinions of record. (Document No. 21 at 13-14.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2006). "This assessment of your remaining capacity for work is not a

decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2006).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests

16

with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2004). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2006). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to

treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2004). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2004). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2006). Ultimately, it is the responsibility of the

18

Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

a. *Dr. Shammaa.*

The ALJ reviewed and summarized the medical evidence of record, including Claimant's treatment with Drs. Shammaa, Butcher, and Evans. (Tr. at 26-29, 30-31.)  The ALJ considered Dr. Shammaa's opinion of December 20, 2005, that Claimant was unable "to work at a job secondary to the frequency/urgency of urination which would interfere with a job, regardless of sedentary or not. She states that she has difficulty with lifting secondary to being unable to control the leakage of her bladder." (Tr. at 31, 416.) The ALJ determined that Dr. Shammaa's opinion was not entitled to significant weight because it "is not supported by the evidence of record and appears to be based primarily on the claimant's subjective symptoms." (Tr. at 31.) The ALJ acknowledged Claimant's reports of urgency and incontinence, as well as her reported difficulty lifting due to leakage. (Id.) However, he noted that "if in fact this was a problem of the magnitude which she alleges, the claimant would have undergone further treatment and testing by now." (Id.)

As the Commissioner points out, Dr. Shammaa opines that Claimant cannot do even sedentary exertional level work due to lifting secondary to her inability to control the leakage of her bladder. Pursuant to Social Security Ruling ("SSR") 83-10, sedentary work however, does not require the bending and squatting that would cause Claimant's urinary leakage. (Document No. 21 at 13.)

19

Furthermore, Claimant reported that she used Depends to control the urinary leakage, and as the ALJ pointed out, Claimant reported to medical sources only two instances in which the bladder problems caused her to "soil" herself. Accordingly, the undersigned finds that the ALJ's decision that neither Claimant's bladder problem was disabling nor that Dr. Shammaa's opinion was entitled significant weight is supported by substantial evidence.

b. *Dr. Butcher*.

The ALJ also considered the March 2, 2004, opinion of Claimant's primary care physician, Dr. Butcher, that Claimant was unable to work pending "further neurologic work-up." (Tr. at 31, 408.) The ALJ determined that Dr. Butcher's opinion was not entitled to significant weight because when the opinion was rendered, and thereafter, the evidence "revealed only mild neurological findings, which are essentially inconsistent with a complete inability to work." (Tr. at 31.) The medical evidence, as discussed above, revealed a normal brain MRI scan (Tr. at 31, 1982, 237.) Dr. Evans noted a normal neurological exam and opined that Claimant was capable of performing light to moderate activity. (Tr. at 31, 207-09.) Likewise, the neurological exams of Dr. Murugappan and Dr. Shammaa essentially were normal with minimal findings. (Tr. at 31, 256-63, 314-24.) Dr. Othman acknowledged Claimant's multiple neurological complaints, but opined that she had mild, if any, neurological findings, objectively. (Tr. at 31, 332.) Accordingly, the undersigned finds that the ALJ's decision not to accord significant weight to Dr. Butcher's opinion that Claimant could not work is supported by substantial evidence of record.

c. *Dr. Evans*.

The ALJ considered the June 27, 2004, opinion of consultative evaluator Dr. Evans. (Tr. at 31, 207-12.) The ALJ accorded significant weight to Dr. Evans's opinion "as it is consistent with the overall evidence of record, including the minimal findings on diagnostic testing and on physical

20

examinations." (Tr. at 31.) The undersigned has discussed Dr. Evans's opinion above and noted its consistency with the substantial evidence of record. Accordingly, the undersigned finds that the ALJ's opinion to accord significant weight to the opinion of consultative examiner Dr. Evans is supported by substantial evidence of record.

d. <u>State Agency medical consultants</u>.

Finally, the ALJ considered the opinions of the state agency medical consultants. (Tr. at 31-32.) Specifically, the ALJ acknowledged the July 13, 2004, opinion of Rogelio T. Lim, M.D., who opined that Claimant was capable of performing medium exertional level work, with no further limitations. (Tr. at 32, 213-21.) He further acknowledged the December 28, 2004, opinion of Rosalind L. Go, M.D., who opined that Claimant was capable of performing medium exertional level work, with frequent postural limitations. (Tr. at 32, 268-76.) The ALJ agreed with these state agency medical consultants that Claimant was capable of performing basic work activities, but determined that Claimant's activities were more restricted than they assessed. (Tr. at 32.) The ALJ therefore, based on the overall evidence, limited Claimant to performing only light exertional level work. (<u>Id.</u>) The ALJ having been more restrictive than the state agency medical consultants in his RFC assessment, the undersigned finds that this decision is to Claimant's advantage and is supported by the substantial evidence of record, including Claimant's testimony as will be discussed below.

The ALJ also acknowledged the February 19, 2005, opinion of Debra L. Lilly, Ph.D., another state agency medical consultant, that Claimant had only mild limitations in activities of daily living and maintaining social functioning, concentration, persistence, or pace, and had experienced one or two episodes of decompensation. (Tr. at 32, 299-313.) Dr. Lilly further opined that Claimant's severe mental impairments were durational and not expected to last for twelve continuous months. (Tr. at 32, 311.) The ALJ however, determined that Dr. Lilly's opinion "is not supported by the overall evidence

21

of record, as the evidence of record actually reveals that these impairments have in fact lasted for 12 continuous months and have resulted in moderate difficulties in the claimant's concentration, persistence, and pace." (Tr. at 32.)

The ALJ's decision was based on the January 17, 2005, mental status examination of Ms. Bell; the progress notes of Dr. Hamm; and the progress notes from Stephanie Mendelson of Willow Ridge, all of which were discussed above. (Tr. at 32, 222-46, 282-88, 289-98, 366-90, 401-04.)These records reflect continuing mental health treatment. Based on these records, the undersigned finds that the ALJ's decision that Claimant's mental impairments were expected to last twelve consecutive months contrary to Dr. Lilly's opinion, is supported by substantial evidence.

Based on the foregoing, the undersigned finds that the ALJ properly considered the factors of 20 C.F.R. §§ 404.1527(d) and 416.927(d) in not according significant weight to Claimant's treating physicians, as well as according significant weight to the opinion of the consultative examiner and in considering the opinions of the state agency medical consultants. Accordingly, the undersigned finds that the ALJ's decision in these regards is supported by substantial evidence.

B. *Pain & Credibility Assessment*.

Claimant also alleges that the ALJ erred in his pain and credibility assessment in that he made no mention of the standard enunciated in Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996), and therefore, improperly first attacked Claimant's credibility without making the threshold finding. (Document No. 17 at 22-23.) Claimant further alleges that in his RFC assessment, the ALJ failed to mention the following exertional and non-exertional impairments: (1) radicular low back and bilateral leg pain and weakness, (2) bilateral foot problems, (3) left hand and arm tremors, (4) left-sided weakness, (5) affects of obesity, (6) blind spots in both eyes, and (7) blurred vision. (Id. at 20-21, 23.)

The Commissioner asserts that the ALJ found under the first prong of Craig that Claimant did

not have an impairment or condition reasonably likely to cause her alleged limitations. (Document No. 21 at 17.) Consequently, the ALJ did not reach the second prong, but gave Claimant the benefit of the doubt and accommodated her many allegations in his RFC assessment. (Id.) The Commissioner further asserts that the ALJ properly considered the symptoms of Claimant's several impairments, including her obesity and mental impairments, and accommodated them in his RFC assessment. (Id. at 15-19.)

A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2006); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996). If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595. When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2006). Additionally, the Regulations provide that:

> [w]e will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:

23

(i) Your daily activities;

(ii) The location, duration, frequency, and intensity of your pain or other symptoms.

(iii) Precipitating and aggravating factors;

(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2006).

SSR 96-7p repeats the two-step regulatory provisions:

First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the ALJ must accompany his decision with sufficient explanation to allow a reviewing Court to determine whether the Commissioner's decision is supported by substantial evidence. "[T]he [Commissioner] is required by both the Social Security Act, 42 U.S.C. § 405(b), and the Administrative Procedure Act, 5 U.S.C. § 557(c), to include in the text of [his] decision a statement of the reasons for that decision." Cook v. Heckler, 783 F.2d 1168, 1172 (4th Cir. 1986). The ALJ's "decisions should refer specifically to the evidence informing the ALJ's conclusion. This duty of explanation is always an important aspect of the administrative charge . . . ." Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985).

In the instant case, the ALJ noted the requirements of the applicable law and Regulations regarding the assessment of pain and credibility. (Tr. at 29.) Though the ALJ did not cite specifically the Fourth Circuit's decision in Craig, he nevertheless cited the appropriate Regulations and Social Security Rulings and adhered to the two-step analysis contained therein. (Tr. at 29-32.) The ALJ found, at the first step of the analysis, that "while the claimant alleges that she suffers from debilitating pain, which renders her unable to walk, stand or sit for prolonged periods of time, the objective medical evidence of record reveals that the claimant does not have conditions, which would reasonably be expected to cause such limitations." (Tr. at 30.) Thus, the ALJ made an adequate threshold finding. Though he did not need to proceed to the second step of the analysis, as the Commissioner points out, the ALJ nonetheless proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 30-32.) At the second step of the analysis, the ALJ concluded that "in light of the medical evidence of record, the undersigned finds that the claimant is not entirely credible." (Tr. at 30.)

The ALJ summarized Claimant's testimony in his decision, noting that Claimant stated that she experienced numbness and tingling in her arms and legs three times a week; that she had anxiety and

depression for which she received counseling, which had not helped, and was prescribed medication; and that she experienced chest pain two to five times a week when anxious. (Tr. at 30, 447-50, 452-53.) The ALJ further noted Claimant's testimony that she saw large areas of color in her vision and that her vision condition had been ongoing for five or six years and lasted twenty minutes to one hour per occasion. (Tr. at 30, 457-59, 462.) The ALJ summarized Claimant's testimony regarding pain and arthritis in her hips, shoulders and neck, as well as carpal tunnel syndrome in the right hand, which prevented her from holding objects. (Tr. at 30, 453.) The ALJ thus noted the nature and location of Claimant's pain, and further noted the testimony that she can walk only forty to fifty feet and stand for ten to twenty minutes, with the need to alternate between sitting and standing. (Tr. at 30, 454.) He further noted Claimant's poor vision, which limited her ability to read; blurred vision; memory problems; problems with her porphyria two times a week; and problems with incontinence. (Tr. at 30, 446, 452, 457-61.) The ALJ also noted that Claimant received therapy and medications for her mental impairments and noted the side effects of Claimant's medication, Neurontin, to include hives. (Tr. at 28, 446, 448-49.)

The ALJ also summarized Claimant's testimony regarding her activities of daily living. (Tr. at 30, 455-57.) Claimant testified that she was able to dust and fold laundry. (Tr. at 30, 455.) The ALJ referenced Claimant's activities of daily living as reported in written statements and those activities reported to Ms. Bell and her treating physicians and counselor. (Tr. at 128-32, 282-88, 289-98, 366-90.) In a Personal Pain Questionnaire dated May 10, 2004, Claimant reported that she sometimes had difficulty walking, stooping, bending, grasping, holding, lifting even pens and utensils, and cooking. (Tr. at 29, 128.) In a form Activities of Daily Living also dated May 10, 2004, Claimant reported that she required assistance getting in and out of the bathtub and had abandoned arranging her hair or applying makeup. (Tr. at 133-39.) When possible, she reported that she did laundry, dusted furniture,

26

paid bills, and washed dishes, with the help from her companion and son. (Tr. at 134-35.) She further reported that when possible, she shopped for food, clothing, and medication for one and one half hours, once a month. (Tr. at 135.) Claimant indicated that she watched television, including the news, for forty-five minutes at a time, and occasionally visited neighbors. (Tr. at 135-36.)

On January 17, 2005, Claimant reported to Ms. Bell on mental status examination that she sometimes read, watched television, talked to her granddaughter on the telephone, and independently performed grooming and hygiene. (Tr. at 29, 285.) She further noted that she, her companion, and her son shared in housework, cooking, dishes, laundry, and shopping. (Id.) Claimant noted that she occasionally drove, sat outside, enjoyed reading history books, and managed her finances with her companion's assistance. (Id.)

Accordingly, the undersigned finds that the ALJ properly considered Claimant's pain and other symptoms pursuant to the factors set forth in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). Contrary to Claimant's assertions, the ALJ adequately considered Claimant's exertional and non-exertional impairments. As the Commissioner points out, and as discussed above, the ALJ's consideration of Claimant's disease process included the symptoms of Claimant's pain in her low back, legs, and feet, as well as her left hand and arm tremors and left-sided weakness, together with the impact of obesity on her pain. (Document No. 21 at 15.) The ALJ noted that neurological exams were normal, and "that the claimant's examining neurologists, have noted on numerous occasions, that her alleged symptoms are not commensurate with the findings on diagnostic testing and the minimal findings on examination." (Tr. at 30.) Additionally, Claimant's multiple sclerosis test was normal. (Tr. at 315, 412.) Nevertheless, given Claimant's mild cervical disc disease and mild carpal tunnel syndrome, the ALJ limited Claimant to performing light exertional level work. (Tr. at 30.)

The ALJ further acknowledged Claimant's allegation of having suffered from porphyria for

27

the past five to six years, despite blood testing that ruled out such a diagnosis. (Tr. at 30, 392.) Nevertheless, the ALJ restricted Claimant from performing jobs that required concentrated or excessive exposure to sunlight and concentrated exposure to extreme cold or dampness. (Tr. at 30.) Regarding claimant's blind spot of the right eye and blurred vision, the ALJ noted that it was believed that her condition resulted from complicated migraines and that there were no neurological bases for her loss of vision. (Tr. at 31, 332.) Nonetheless, the ALJ considered Claimant's blind spot when determining whether she could perform other work in the economy. (Tr. at 31.) Moreover, the medical evidence revealed that Claimant's visual impairments were only temporary, and that her left eye was borderline. (Tr. at 341.) As the Commissioner notes, Claimant reported that she occasionally drove a vehicle despite such visual impairment.

As discussed above, the ALJ also considered Claimant's alleged bladder problems. (Tr. at 31.) The ALJ, however, determined that if Claimant had a problem of the magnitude which she alleged, she "would have undergone further treatment and testing by now." (Tr. at 31.) Finally, the ALJ also considered Claimant's allegations of continued severe depression and anxiety, despite counseling. (Tr. at 30.) The ALJ noted that the medical evidence revealed that her condition had improved with treatment and that her symptoms were not as severe as she alleged. (Id.) As the Commissioner notes, despite Claimant's allegations that she had low GAF scores of 35 and 45-50, the evidence of record, as well as the evidence submitted subsequent to the ALJ's decision tends to indicate that Claimant's subjective symptoms improved. (Document No. 21 at 19; Tr. at 11-19.) Notwithstanding the subsequently submitted evidence, the evidence that was before the ALJ did not support a finding that Claimant's mental impairments were debilitating.

Accordingly, based on the foregoing, the undersigned finds that the ALJ's RFC assessment was made in conformity with the appropriate law and Regulations, and is supported by substantial

evidence.

3. <u>Hypothetical Questions</u>.

Finally, Claimant alleges that the ALJ erred in presenting hypothetical questions to the vocational expert ("VE") because he failed to include all of Claimant's significant exertional and non-exertional impairments and limitations. (Document No. 17 at 24-26.) Specifically, Claimant asserts that the ALJ failed to include his left hand and arm tremors, headaches, left-sided weakness, obesity, low back and leg pain, bilateral foot pain, blurred vision, blind spots in both eyes, poor balance, and urinary incontinence. (<u>Id.</u> at 24-25.)The Commissioner asserts that because the ALJ's RFC assessment is supported by substantial evidence, the VE's testimony, which was in response to a proper hypothetical question, satisfies the ALJ's only step five burden. (Document No. 21 at 11.)

To be relevant or helpful, a vocational expert's opinion must be based upon consideration of all evidence of record, and it must be in response to a hypothetical question which fairly sets out all of the claimant's impairments. <u>Walker v. Bowen</u>, 889 F.2d 47, 51 (4th Cir. 1989). "[I]t is difficult to see how a vocational expert can be of any assistance if he is not familiar with the particular claimant's impairments and abilities – presumably, he must study the evidence of record to reach the necessary level of familiarity." <u>Id.</u> at 51. Nevertheless, while questions posed to the vocational expert must fairly set out all of claimant's impairments, the questions need only reflect those impairments that are supported by the record. <u>See</u> <u>Chrupcala v. Heckler</u>, 829 F.2d 1269, 1276 (3d Cir. 1987). Additionally, the hypothetical question may omit non-severe impairments, but must include those which the ALJ finds to be severe. <u>See</u> <u>Benenate v. Schweiker</u>, 719 F.2d 291, 292 (8th Cir. 1983).

In the ALJ's hypothetical questions to the VE, he included all of Claimant's impairments that were supported by the record. (Tr. at 470-72.) The ALJ first asked whether a person of Claimant's age, education, and past relevant work experience, who had the residual functional capacity for light work,

and could perform limited routine and repetitive tasks, with no exposure to outdoor work involving extensive and concentrated exposure to sunlight or concentrated exposure to extreme cold or dampness, and no operation of motor vehicles or exposure to dangerous situations such as unprotected heights or dangerous equipment, could perform any work. (Tr. at 470.) In response to the ALJ's hypothetical, the VE responded that such person could perform light, unskilled jobs such as a hand packer, price marker, and produce sorter. (Tr. at 470-71.) The ALJ then asked whether any of the jobs identified would be altered if the hypothetical person was incapable of being regular in attendance for a forty-hour workweek consisting of eight-hour days. (Tr. at 471.) The VE responded that such a limitation would preclude all work activity. (Tr. at 471-72.) Claimant's counsel then expanded the ALJ's first hypothetical question and asked whether any of the jobs identified would be altered if the hypothetical person was required to go to the bathroom twice an hour and soiled herself once a day during work hours. (Tr. at 472.) The VE responded that such a limitation would preclude all work activity. (Id.) Claimant's counsel then asked whether any of the jobs identified would be altered if the hypothetical person had blurred vision and blind spots in both eyes, which impaired vision. (Id.) The VE likewise responded that such limitations would preclude all work activity. (Id.) The ALJ then asked whether any of the jobs would be altered if the hypothetical person had only an enlarged blind spot in the right eye without considering blurred vision. (Tr. at 473.) The VE responded that the person would be able to perform the jobs identified, though the numbers would be slightly reduced. (Id.)

The ALJ's RFC findings accommodate the first hypothetical question and the ALJ specifically found that the medical evidence did not support the extent of Claimant's bladder problem as alleged. The ALJ included the limitation of light exertional level work, which as discussed above, accommodated Claimant's back, leg, and foot pain. The evidence does not support the severity of Claimant's alleged neurological problems, and therefore, the ALJ properly did not include limitations

30

for Claimant's left hand tremors, headaches, weakness, and imbalance. The medical evidence indicated that these conditions rarely occurred. Furthermore, regarding Claimant's blind spots and blurred vision, the evidence of record demonstrated that such conditions occurred only occasionally, and that Claimant's left eye was only borderline. Nevertheless, the ALJ precluded Claimant from driving or operating dangerous equipment, which limitation accommodated Claimant's visual and neurological problems. Accordingly, the undersigned finds that the hypothetical questions were proper, included those limitations supported by the record, and that the ALJ's decision is supported by substantial evidence.

## PROPOSAL AND RECOMMENDATION

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 15.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 21.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review

31

by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  <u>Snyder v.</u>
<u>Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155, 106 S.Ct. 466, 475,
88 L.Ed.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); <u>Wright</u>
<u>v. Collins</u>, 766 F.2d 841, 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.),
<u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall
be served on opposing parties, Judge Johnston, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy
of the same to counsel of record.

Date: August 29, 2008.

R. Clarke VanDervort
United States Magistrate Judge

32